# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| Ronald D. Conte, | Case No. 1:21-cv-1913 |
| Plaintiff, | |
| -vs- | |
| | JUDGE PAMELA A. BARKER |
| John White, et al., | |
| Defendants. | MEMORANDUM OPINION AND ORDER |

This matter is before the Court upon the Motion for Summary Judgment of Defendants John White ("Defendant White" or "Officer White") and Lori Beasley ("Defendant Beasley" or "Officer Beasley") (referred to collectively as "Defendants") filed on June 29, 2023.  (Doc. No. 25.)  Plaintiff Ronald D. Conte ("Plaintiff" or "Conte") filed a Response on August 1, 2023 (Doc. No. 28), to which Defendants replied on August 15, 2023 (Doc. No. 29).  For the reasons set forth herein, Defendants' Motion is GRANTED IN PART and DENIED IN PART.

## I.  Facts

This matter involves an incident that occurred at Richland Correctional Institution ("RCI") on October 8, 2019.  At that time, Conte was an inmate at RCI and was housed in a dormitory-style housing unit known as "H4-Lower" Dormitory.   (Depo. of Ronald Conte (Doc. No. 22) at Tr. 10-11.)  Defendants Beasley and White were employed at RCI as Corrections Officers.  (Depo. of L. Beasley (Doc. No. 23) at Tr. 5-6; Depo. of J. White (Doc. No. 24) at Tr. 5.)

On a typical day, a "count" was taken of the inmates in the H4-Lower Dormitory at 11:00 a.m., at which time all inmates were required to be present in the housing unit.  (Conte Depo. at Tr. 22.)  Inmates were not permitted to leave the H4-Lower Dormitory until "count cleared," i.e., until

prison officials had completed the count.  (Conte Depo. at Tr. 20-21; Beasley Depo. at Tr. 6-7.)  After "count cleared," inmates with medication passes and/or badges were permitted to leave the H4-Lower Dormitory to go to the prison infirmary for their medications.  (Beasley Depo. at Tr. 7, 13-15.)  To enter or exit the H4-Lower Dormitory, an inmate had to go through a common area (or "day room") to an exit door located next to the office of Unit Manager, Daniel Deskins.[1]  *See* Video Surveillance Footage ("VSF"); Declaration of Daniel Deskins (Doc. No. 25-1) at ¶ 5.  This door is manned by a corrections officer, who checks inmates' medication passes/badges before allowing them to go to the prison infirmary.  (Beasley Depo. at Tr. 6.)  The door opens onto a sally port that is located within the building.  (Conte Depo. at Tr. 27; White Depo. at Tr. 40.)

It is undisputed that, on October 8, 2019, Conte had a Medication Pass.  (Conte Depo. at Tr. 20, 60; Conte Decl. (Doc. No. 28 at PageID#s 450-452) at ¶ 6; Beasley Depo. at Tr. 6-7.)  Conte testified that this Pass was issued so that he could take an unidentified "psych med."  (Conte Depo. at Tr. 11; Conte Decl. at ¶ 6.)  The Pass provides that: "[y]our Med. Pass (controlled medication) will be administered at the times indicated below," which was then identified on the Pass as "Midday," Sunday through Saturday.  (Doc. No. 28 at Page ID# 449.)  In addition, the specific time of "11:30" was handwritten below the word "Midday" on the Pass.  (*Id*.)  Conte testified that, prior to October 8, 2019, he was permitted to leave the H4-Lower Dormitory at 11:30 a.m. to go to the infirmary to receive his medication.[2]  (Conte Depo. at Tr. 20.)

---

[1] The video shows (and Conte explained during his deposition) that the H4-Lower Dormitory has a "bunk area" (or sleeping area) on one side, and a common area (or day room) on the other side.  The two sides of the Dormitory are separated by a wall that extends most (but not all) of the length of the dormitory.  *See* VSF; Conte Depo. at Tr. 26-27.

[2] Conte further testified that, during this time, he was permitted to attend a computer class that began at noon and ended at approximately 2:15 p.m. (Conte Depo. at Tr. 17-18.)  Conte explained that, prior to the incident on October 8, 2019, he would get his medication at 11:30 a.m. and then go directly to his computer class.  (*Id*. at Tr. 20-21.)

On October 8, 2019, Officers Beasley and White were working as "relief officers" in the H4-Lower Dormitory.  (White Depo. at Tr. 26; Beasley Depo. at Tr. 41; Conte Depo. at Tr. 13.)  Officer Beasley was posted at the door and checking the Medication Passes/Badges of inmates who were lined up to go to the infirmary.  (Beasley Depo. at Tr. 6-7.)  Officer White was posted across the day room, standing in such a way that he could see the bunk area, the day room, and the door to the sally port.  (White Depo. at Tr. 22, 37.)  Officer White estimated that he was standing approximately 20 to 30 feet away from the door exiting the day room.  (*Id*.)

Defendants produced video surveillance footage of an incident that occurred at approximately 11:30 a.m. on October 8, 2019.  As the video begins (at 11:30:19 on the video), Officer Beasley is stationed at the door to the sally port.  (VSF at 11:30:19; Beasley Depo. at Tr. 6, 51-52.)  A line of inmates can be seen approaching and exiting through the door.  (VSF at 11:30:19 – 11:30:26.)  It is undisputed that these inmates are diabetic and had orange "indicators" on their badges that allowed them to leave the dorm at 11:30 a.m. to obtain their insulin treatment.  (Conte Depo. at Tr. 24; Beasley Depo. at Tr. 15-16, 80-81.)  Immediately after the last of the diabetic inmates leaves the H4-Lower Dormitory, Officer Beasley turns to speak to Conte, who is standing a few steps away from the door.  (VSF at 11:30:26.)  The video surveillance footage does not have audio; however, it is undisputed that Officer Beasley and Conte became engaged in an argument about whether Conte was permitted to leave the H4-Lower Dormitory at that time.  (Conte Depo. at Tr. 24; Beasley Depo. at Tr. 6-7, 21.)  Conte testified that he told Officer Beasley that he was permitted to leave because of the handwritten "11:30" on his Medication Pass.  (Conte Depo. at Tr. 24.)  Officer Beasley testified that she disagreed and told Conte he was not permitted to leave until after the H4-Lower Dormitory was called for "chow."  (Beasley Depo. at Tr. 7, 15.)

3

The video footage shows Officer Beasley take Conte's Medication Pass away from him and hold it in front of him as they continue to argue.  (VSF at 11:30:36 – 11:30:38.)  The video footage is blurred and grainy but, at one point, appears to show Conte reaching out his arm towards Officer Beasley.  (*Id*. at 11:30:50 – 11:30:52.)  In deposition, Conte acknowledged that he tried to "swipe" the Pass out of Officer Beasley's hands.  (Conte Depo. at Tr. 29.)  Officer Beasley testified that Conte tried to "slap" the Pass out of her hands.  (Beasley Depo. at Tr. 7, 17.)  Meanwhile, at approximately 11:30:47 on the video, Officer White can be seen walking across the day room towards Officer Beasley and Conte.  (VSF at 11:30:47.)  Officer White testified that he approached Officer Beasley and Conte because he heard loud voices and observed that they were arguing.  (White Depo. at Tr. 14.)  Officer White further testified that, as he walked towards them, he believed he saw Conte take a "backhanded swipe" at Officer Beasley.[3]  (*Id*.)

Officer White reached Officer Beasley and Conte at approximately 11:30:58 on the video.  Officer White testified that he told Conte that he could not leave to get his medication until "chow."  (White Depo. at Tr. 15.)  Officer White can be seen separating Officer Beasley and Conte and reaching for his handcuffs.  (VSF at 11:30:59.)  According to Officer White, he repeatedly told Conte to "cuff up" but Conte kept arguing with Officer Beasley.  (White Depo. at Tr. 15.)

At 11:31:06 on the video, Unit Manager Deskins comes out of his office and walks over towards where Officer Beasley, Officer White, and Conte are standing.  (VSF at 11:31:06.)  Conte turns his back to Officer White and faces the window of Deskins' office.  (*Id*. at 11:31:07.)  Officer White proceeds to handcuff Conte, who does not resist.  (*Id*. at 11:31:09 – 11:31:19.)  Deskins then

---

[3] Beasley testified that Conte did not raise his arm or fist as if he was going to strike her.  (Beasley Depo. at Tr. 28.)  Conte avers that he did not strike or attempt to strike Beasley.  (Conte Decl. (Doc. No. 28 at PageID#s 450-452) at ¶ 7.)

4

approaches Officer White and Conte, and Conte's head appears to turn towards Deskins.  (*Id*.)  Conte acknowledged in deposition that he was continuing to speak with Deskins as Officer White was cuffing him.  (Conte Depo. at Tr. 32-34.)  *See also* Declaration of D. Deskins (Doc. No. 25-1) at ¶ 8-9.)

At 11:31:19 on the video, Officer White begins escorting Conte towards the exit door.  Conte continues to speak with Deskins as he is being escorted by Officer White, with Conte partially turning his body towards Deskins as he is being led to the door.  (VSF at 11:31:19 – 11:31:22; Conte Depo. at Tr. 32-34.)  The video footage appears to show Officer White pulling Conte towards the door as Conte is still engaging in conversation with Deskins.  (VSF at 11:31:23 – 11:31: 24; Conte Depo. at Tr. 33-34.)  *See also* Doc. No. 25 at p. 8.  At 11:31:25 on the video, as Officer White is pulling on Conte to escort him out of the day room, Conte appears to accelerate and collide with the doorframe.  (VSF at 11:31:25.)  Conte then falls through the exit door onto the floor just inside the sally port area.  (*Id*.)  The video then shows Officer White stumbling and falling either on or near Conte.  (*Id*.)

The parties strongly disagree regarding what happened as Officer White was escorting Conte out of the day room.  Conte testified in deposition that Officer White intentionally pushed him into the doorframe, which then caused him to fall through the door.  (Conte Depo. at Tr. 25, 34.)  *See also* Conte Decl. at ¶ 7 (averring that White "slammed [him] violently hard into [the] exit door.")  Conte also introduced evidence in the form of Declarations from inmates Darryl Smith and Bruce Arnoff, wherein they averred that they observed the incident on October 8, 2019 and witnessed Officer White violently slam Conte into the exit doorframe.  *See* Smith Decl. (Doc. No. 28 at PageID#s 454-455) and Arnoff Decl. (Doc. No. 28 at PageID# 456) at ¶ 6.

Officers White and Beasley denied that White pushed Conte into the doorframe.  (Beasley Depo. at Tr. 13; White Depo. at Tr. 15, 45, 51.)  Officer White testified that he did not know what caused Conte to fall but that he believed that Conte "lurched or tripped" and fell through the exit door.  (White Depo. at Tr. 15, 45, 51.)  Officer Beasley testified in deposition that Conte fell through the exit door, possibly because he had tripped over a rug in the sally port.  (Beasley Depo. at Tr. 7-8, 30-34.)  Lastly Deskins submitted a Declaration in which he averred that:

> From my observation of this occurrence, it is not my belief or understanding that Officer White intentionally pushed or dragged Mr. Conte into the door frame or floor. On the other hand, I cannot form an opinion as to why Mr. Conte fell.  It is my understanding and belief from what I observed of this occurrence is [sic] that it was an unfortunate accident at the fault of no individual, including Mr. Conte or Officer White.

(Deskins Decl. at ¶ 20.)

There is also disagreement regarding what happened after Conte fell.  The video footage is unclear, both because of the camera angle and because of backlighting from the sally port area that makes it difficult to see precisely what is happening.  The video shows Conte on the ground, with Officer White also on the ground either on or near him.  (VSF at 11:31:26.)  After a few seconds, Officer White stands up, and both Officer Beasley and Deskins come to the doorway.  (*Id.* at 11:31:27 -11:31:30.)  The video shows Officers White and Beasley bending over Conte.  (*Id*. at 11:31:31 – 11:31:35.)  Officers White and Beasley and Mr. Deskins all appear to assist in rolling Conte over. (*Id.* at 11:31:36 – 11:31:38.)  Officer White then appears to attempt to lift Conte to a standing position. (*Id*. at 11:31:36 – 11:31:40.)  To do so, Officer White appears to place one of his hands under Conte's arms and attempt to lift him from the ground.  (*Id*.)  It is not clear what Officer White is doing with his other hand.  (*Id*.)  Officer White then stops trying to move Conte to a standing position, and Conte remains lying on the ground.  (*Id*. at 11:31:41 – 11:32:11.)  The video footage ends approximately 45

seconds after Conte's fall (at 11:31:12), with Conte on the ground and Officer White, Officer Beasley, and Mr. Deskins standing around him.  (*Id*. at 11:32:12.)

Conte, White, Beasley, and Deskins each testified and/or averred to different recollections of what happened after Conte fell.  Conte testified (and averred in a subsequent Declaration) that he lost consciousness when he collapsed on the floor.[4]  (Conte Decl. at ¶ 7; Conte Depo. at Tr. 25, 36.)  He testified that, when he came to, he was in pain and on the ground.  (Conte Depo. at Tr. 25.)  Conte testified that he remembers Officer White ordering him to get up and another, unidentified officer threatening to "spray him with mace" if he did not get up.  (*Id*.)  Conte testified that he told Officer White that he could not get up because he was hurt.  (*Id*. at Tr. 25, 37.)  Conte insists that Officer White tried to "yank [him] up by the handcuffs," even though he was on the ground and in pain.  (*Id*. at Tr. 25, 37-38.)

According to Officer White, Conte did not lose consciousness after he fell.  (White Depo. at Tr. 45-46.)  Officer White testified that he tried to sit Conte up, but Conte started complaining that his hip hurt.  (*Id*. at Tr. 15.)  Officer White stated that he rolled Conte over so that Conte could get up, but Conte said he was unable to stand.  (*Id*. at Tr. 47.)  Officer White testified that he attempted to "help [Conte] up" by lifting him by his arm and forearm.  (*Id*. at Tr. 34.)  He denied ever trying to lift Conte by his handcuffs.  (*Id*. at Tr. 17, 34, 47-49.)  Officer White stated that he called for a "Red Barron," i.e., a mini ambulance van.  (*Id.* at Tr. 15.)  Officer White stated that, once a yard officer and medical arrived, he (White) went back to his post.  (*Id.* at Tr. 15-16, 48.)

---

[4] In addition, in his Declaration, inmate Smith avers that "Conte collapsed unconscious" after being "violently slammed" into the door frame.  (Smith Decl. at PageID# 454.)

7

Officer Beasley also testified that Conte did not lose consciousness after he fell.  (Beasley Depo. at Tr. 61.)  She stated that Conte "seemed fine" and she never heard Conte complain of hip pain.  (*Id*. at Tr. 13, 35-37.)  Officer Beasley testified that "we never called for medical" because "no medical was needed."  (*Id*. at Tr. 37.)  She stated several times that she did not know that Conte needed medical assistance.  (*Id*. at Tr.  13, 39, 61.)  Contrary to Officer White's testimony, Officer Beasley testified that she saw Officer White try to lift Conte up by his cuffs, i.e., with one hand on Conte's cuffs and another hand on one of Conte's arms.  (*Id*. at Tr. 35, 62.)  Officer Beasley stated that they "passed [Conte] off to the yard officer" and that she does not know what happened to Conte thereafter.  (*Id*. at Tr. 8, 35-36, 39.)

Finally, Mr. Deskins averred, in relevant part, as follows:

11. After Mr. Conte fell, I observed Officer White attempting to assist Mr. Conte get up from and off of the ground.  Mr. Conte was in obvious distress, and Officer White was unable to assist Mr. Conte get up from and off of the ground. At that time, Officer White assisted Mr. Conte in rolling over to a better, and more comfortable, position on the ground.

12. It was at this time that another female staff member approached, and I instructed her to summon medical personnel and a "yard" officer to the scene so as to address Mr. Conte's situation and distress.

13. Within one to two minutes of Mr. Conte falling, medical personnel arrived in a "Red Barron," which is a utility vehicle, so as to medically assist Mr. Conte.  A "yard" officer also approached the scene. Once medical personnel and the "yard" officer presented to the scene, Officers Beasley and White returned to their posts within the "H4-Lower" housing unit.

(Deskins Decl. at ¶¶ 11-13.)

8

It is undisputed that Conte was not placed on the Red Barron and was, instead, helped into a wheelchair by other inmates.[5]  (Deskins Decl. at ¶ 14; Conte Depo. at Tr. 39.)  Conte was taken to the prison infirmary.  (Conte Depo. at Tr. 41.)  He underwent x-rays, which showed a fractured femur.  (*Id*. at Tr. 41-43.)  Conte was then taken by wheelchair to "the hole," i.e., to the segregation unit.  (*Id*. at Tr. 41.)  Later that day, he was taken to the hospital where he was given pain medication and underwent "confirming x-rays."  (*Id*. at Tr. 43.)  Conte was admitted to the hospital and underwent surgery the next day for a broken femur.  (*Id*. at Tr. 43-44.)  He testified that he stayed at the hospital for several days and was then transferred to a prison medical facility in Columbus, Ohio.  (*Id*. at Tr. 44.)  Conte testified that he stayed at the prison medical facility for approximately two weeks, after which he returned to RCI.  (*Id*.)  *See also* Conte Decl. at ¶ 8.

Conte testified that, once he was back at RCI, he was put in "the hole" for two weeks for disciplinary infractions relating to the October 8, 2019 incident.  (Conte Depo. at Tr. 45.)  Thereafter, he returned to the H4-Lower Dormitory, where he continued to use a walker until his release in February 2020.  (*Id*. at Tr. 46-47.)  Conte testified that, after his release, he participated in twelve weeks of physical therapy.  (*Id*. at Tr. 50.)  He testified that he continues to experience hip pain when he walks up and down steps or sits for extended periods of time.  (*Id*. at Tr. 49, 51-52.)

## II.    Procedural History

On October 8, 2021, Conte filed a Complaint in this Court against Defendants White, Beasley, and "John Doe Correction Officer."  (Doc. No. 1.)  Therein, Conte asserted claims under 42 U.S.C.

---

[5] The video surveillance footage ends before the arrival of medical assistance and, thus, sheds no light on what happened once the "Red Barron" and/or medical personnel arrived.

§ 1983 for excessive use of force and failure to provide adequate medical care, as well as state law claims for assault, battery, and violation of Ohio Admin. Code § 5120-9-01.  (*Id*.)

On January 24, 2022, Defendants filed a Motion to Dismiss for Failure to State a Claim.  (Doc. No. 7.)  Conte then filed an Amended Complaint alleging the following causes of action against Defendants Beasley, White, and John Doe Correction Officer No. 1, in both their individual and official capacities: (1) Excessive Use of Force in violation of the Eighth Amendment, against White only (Counts I and II); (2) Failure to Provide Adequate Medical Care in violation of the Eighth Amendment, (Counts III, IV, and V); (3) State Tort Claim/Battery, against White (Count VI); and (4) Violation of Ohio Administrative Code § 5120-9-01, Use of Force, against White (Count VII).  (Doc. No. 8.)  In light of Plaintiff's Amended Complaint, Defendants' Motion to Dismiss was rendered moot. *See* Non-Doc. Order dated Feb. 15, 2022.  On February 28, 2022, Defendants Beasley and White filed an Answer.  (Doc. No. 9.)

On November 2, 2022, Defendants Beasley and White filed a partial Motion for Judgment on the Pleadings, in which they sought dismissal of Conte's official capacity claims and state law claims.  (Doc. Nos. 16.)  Conte filed a response on November 16, 2022, to which Defendants replied on November 28, 2022.  (Doc. Nos. 17, 18.)  On December 22, 2022, this Court issued a Memorandum Opinion & Order granting Defendants' Motion.  (Doc. No. 21.)  In addition to dismissing Conte's official capacity and state law claims, the Court *sua sponte* concluded that Conte's claims against the John Doe Defendant were time-barred and dismissed them on that basis.  (*Id*. at pp. 10-13.)  Thus, all that remains after the Court's ruling are Conte's federal, individual capacity claims against Officers White and Beasley.  (*Id*. at p. 13.)

10

On June 29, 2023, Officers White and Beasley filed the instant Motion for Summary Judgment as to Conte's remaining claims. (Doc. No. 25.) Conte was granted leave to file a Response, instanter, on August 1, 2023. (Doc. No. 28.) Officers White and Beasley filed a Reply on August 15, 2023. (Doc. No. 29.)

## III. Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006). "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law." *Henderson*, 469 F.3d at 487.

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman v. Experian Info. Solutions, Inc.*, 901 F.3d 619, 628 (6th Cir. 2018). In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact." *Ask Chems., LP v. Comput. Packages, Inc.*, 593 Fed. Appx 506, 508 (6th Cir. 2014). The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp.*, 295 Fed. Appx 758, 764 (6th Cir. 2008). "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may

11

also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems.*, 593 Fed. Appx at 508-09. "[T]he nonmoving party may not simply rely on its pleading but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'" *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F. Supp.3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

There is an "added wrinkle" where, as here, there is video evidence. *See Scott v. Harris*, 550 U.S. 372, 378 (2007). As the Sixth Circuit has explained, "[t]o the extent that videos in the record show facts so clearly that a reasonable jury could view those facts in only one way, those facts should be viewed in the light depicted by the videos." *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017) (citing *Harris*, 550 U.S. at 380). However, "[t]o the extent that facts shown in videos can be interpreted in multiple ways or if videos do not show all relevant facts, such facts should be viewed in the light most favorable to the non-moving party." *Id. See also Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015).

## IV.  Analysis

### A.  Excessive Force Claims against Officer White

In Count One of the Amended Complaint, Conte alleges that Officer White used excessive force against him in violation of the Eighth Amendment when he (1) "intentionally slammed Plaintiff into the exit door frame" as he was leading Plaintiff out of the dorm; and (2) "intentionally fell or jumped with his full body weight on top of Plaintiff." (Doc. No. 8 at ¶ 37, referencing ¶¶ 18, 20.)

12

Conte further alleges that Officer White's use of the above force "was not applied in a good faith effort to maintain or restore discipline, but instead was done in a wanton, malicious, sadistic and bad faith manner intentionally meant to cause harm to the Plaintiff and sadistically did cause harm resulting in serious permanent injury that required surgery for repair of a fractured femur." (*Id*. at ¶ 38.)

In Count Two, Conte alleges that Officer White used excessive force against him in violation of the Eighth Amendment when he "attempted to lift Plaintiff by yanking on the handcuffs which were secure behind Plaintiff's back" even though "Plaintiff was unconscious;" and "grabbed Plaintiff by his cuffs and yanked Plaintiff's arms up behind his head inflicting great pain upon Plaintiff attempting to make Plaintiff stand up." (*Id.* at ¶ 41, referencing ¶¶ 21, 26.)  Conte alleges that Officer White "could not have reasonably believed that his actions were lawful." (*Id.* at ¶ 42.)

Officer White moves for summary judgment in his favor on both Counts One and Two. (Doc. No. 25 at pp. 9-14.)  Relying heavily on the video surveillance footage, Officer White maintains there is no genuine issue of material fact that neither the subjective nor objective components of Conte's excessive force claims are met. (*Id*.)  Conte opposes Officer White's Motion, asserting that the video footage "does nothing to negate the material facts that are disputed based on the other evidence presented," including (but not limited to) Conte's deposition testimony and Declaration, and the Declarations of inmates Smith and Arnoff. (Doc. No. 28 at pp. 7-11.)

To maintain a claim under 42 U.S.C. § 1983, a plaintiff must establish that he was deprived of a right secured by the Constitution or the laws of the United States, and that the deprivation was caused by a person acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988); *Simescu v. Emmet Cty. Dep't of Soc. Services*, 942 F.2d 372, 374 (6th Cir. 1991).  Here, there is no

13

dispute that Officer White acted under color of state law.  As such, the only remaining question is whether Conte was deprived of a right secured by the Constitution or the laws of the United States.[6]

As noted above, Conte claims that Officer White used excessive force in violation of the Eighth Amendment.  The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII. "The Supreme Court has long held that the Fourteenth Amendment incorporates the Eighth Amendment's ban on 'cruel and unusual punishments' against the States." *Johnson v. Sootsman*, 79 F.4th 608, 615 (6th Cir. 2023) (citing *Robinson v. California*, 370 U.S. 660, 666–67 (1962) and *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 463 (1947)).  The Supreme Court "has also long held that this ban does not just cover the formal 'punishment' that a state court metes out to criminal defendants" but "also applies to informal harms that prison officials inflict on convicted prisoners during their terms of incarceration." *Id*.  This includes the force that prison guards use on prisoners. *Id.  See Whitley v. Albers*, 475 U.S. 312, 320 (1986).

However, the Sixth Circuit has cautioned that "not every shove or restraint gives rise to a constitutional violation." *Cordell v. McKinney*, 759 F.3d 573, 580 (6th Cir. 2014).  On occasion, "[t]he maintenance of prison security and discipline may require that inmates be subjected to physical contact actionable as assault under common law." *Combs v. Wilkinson*, 315 F.3d 548, 556 (6th Cir. 2002).  Prison officials nonetheless violate the Eighth Amendment when their "'offending conduct reflects an unnecessary and wanton infliction of pain.'" *Williams v. Curtin*, 631 F.3d 380, 383 (6th

---

[6] The Court notes that Officer White does not argue, at any point in his Motion for Summary Judgment, that he is entitled to qualified immunity with respect to either of Conte's § 1983 excessive force claims.  (Doc. No. 25.)  Thus, the Court does not address Counts One and Two in the context of a qualified immunity analysis.

Cir. 2011) (quoting *Pelfrey v. Chambers*, 43 F.3d 1034, 1037 (6th Cir. 1995)). *See also Johnson*, 79 F.4th at 615; *Cordell*, 759 F.3d at 580.

The Sixth Circuit recently elaborated on this standard in the context of a correctional officer's use of force, as follows:

> What qualifies as the 'unnecessary and wanton infliction of pain'? This requirement has objective and subjective components, both of which follow from the Eighth Amendment's text. *See Phillips v. Tangilag*, 14 F.4th 524, 535 (6th Cir. 2021); *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011). Objectively, harm to a prisoner must rise to a sufficiently serious level because the Eighth Amendment prohibits only 'cruel and unusual' deprivations, not just uncomfortable or 'even harsh' ones. *Rhodes*, 452 U.S. at 347; *see Phillips*, 14 F.4th at 534. Subjectively, harm to a prisoner must result from a prison official's sufficiently volitional actions because the Eighth Amendment bars only willful conduct that 'inflict[s]' 'punishment,' not accidental conduct that causes injury. *See Phillips*, 14 F.4th at 535 (citing *Wilson v. Seiter*, 501 U.S. 294, 300, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)).

> Yet the nature of these objective and subjective tests 'varies' depending on the type of action (or inaction) that injures a prisoner. *Hudson*, 503 U.S. at 5–6, 8–9. [In the context of a correctional officer's use of force], **the Supreme Court has applied a more demanding subjective test but a more relaxed objective test**. *See id.*

> As a subjective matter, the Court has held that prisoners who challenge a correctional officer's use of force must prove more than that the officer acted with "deliberate indifference" to whether the force was necessary (the type of intent that prisoners must prove to challenge their conditions of confinement or medical care). *See id.* at 5–6; *cf. Wilson*, 501 U.S. at 302–03. **The Court has instead described the 'core judicial inquiry' in this use-of-force context as distinguishing between force used in a 'good-faith effort to maintain or restore discipline' and force used 'maliciously and sadistically to cause harm.'** *Wilkins v. Gaddy,* 559 U.S. 34, 37 (2010) (per curiam) (quoting *Hudson*, 503 U.S. at 7). **Only the latter kind of force—force exerted maliciously and sadistically to inflict pain—violates the Eighth Amendment**. *See Hudson*, 503 U.S. at 5–7. So even if an officer uses force because of an 'unreasonable' belief that it is necessary to restrain a prisoner, the officer does not violate the Eighth Amendment.[7] *Whitley*, 475 U.S. at 324.

---

[7] As discussed *infra*, the Supreme Court has identified several factors to consider in evaluating this issue, as follows: "What was the extent of the prisoner's injury? What was the nature of the threat that justified the use of force? Was the amount of force proportional to the threat? And did the officer take any actions designed to reduce the required amount of force?" *Whitley*, 475 U.S. at 321. *See also Johnson*, 79 F.4th at 618.

15

As an objective matter, the Court has held that prisoners who challenge a correctional officer's use of force need not prove 'extreme' or 'serious' harms (the types of harms that prisoners must allege to challenge their conditions of confinement or medical care). *See Hudson*, 503 U.S. at 9. The Court reasoned that the Eighth Amendment's 'contextual' objective element relies on our 'contemporary standards of decency' to decide whether specific conduct qualifies as cruel and unusual. *Id*. at 8 (quoting Estelle, 429 U.S. at 103). And the malicious and sadistic infliction of pain violates these contemporary standards whether or not the pain leads to any significant injury. *Id*. at 9. After all, 'diabolic' torture sometimes may not cause such an injury. *Id*. At the same time, the Court has added a limiting principle to this conclusion by differentiating an injury from the force that causes it. *See Wilkins*, 559 U.S. at 38. **Although the Eighth Amendment can reach minor injuries caused by significant force, the Court explained, the amendment simply does not apply to 'de minimis uses of physical force' so long as this force does not repulse 'the conscience of mankind.'** *Hudson*, 503 U.S. at 9–10 (citation omitted).

*Johnson,* 79 F.4th at 615-616 (emphasis added).  *See also, generally, Rafferty v. Trumbull County, Ohio,* 915 F.3d 1087, 1094 (6th Cir. 2019); *Cordell*,759 F.3d at 581; *Combs,* 315 F.3d at 556-557.

With the above principles in mind, the Court will address each of Conte's excessive force claims against Officer White separately, below.

### 1. Excessive Force Claim based on Officer White's Escort of Conte (Count One)

Officer White argues that he is entitled to summary judgment in his favor on Conte's claims that he used excessive force by "intentionally slamming" Conte into the exit door frame and then "intentionally [falling] or jump[ing] with his full body weight on top of" Conte.  (Doc. No. 25 at p. 11.) Officer White asserts that "[t]he video surveillance footage is clear and unequivocal" that he did neither of those things.  (*Id*.)  He maintains that, to the contrary, the video footage "clearly shows that Mr. Conte was not following the instructions of Officer White in being escorted, and instead was distracted by his conversation with Unit Manager Deskins."  (*Id*. at pp. 11-12.)  Officer White argues that the video footage is clear that Conte was "not being compliant by distracting himself" and then "simply lost his balance due to his distraction and non-compliance." (*Id.* at p. 12.)  Officer White next

16

maintains that "there is no evidence to support the allegation that [he] intentionally fell or jumped on top of Mr. Conte as he fell or after" and that the video footage "clearly shows [that] Officer White was holding on to Mr. Conte for the purpose of an escort, and the force of Mr. Conte's fall in turn pulled Officer White on top of Mr. Conte." (*Id*.)  In sum, Officer White argues that the "video evidence on the record clearly and blatantly contradicts Mr. Conte's allegations" and no reasonable jury could find that he used excessive force in escorting Conte out of the day room on October 8, 2019. (*Id*.)

Conte argues that "the only question to be answered in this matter is did White intentionally slam Conte's head into the door frame." (Doc. No. 28 at p. 8.)  Conte asserts that the Declarations submitted by Conte, Smith, and Arnoff create a disputed issue of material fact as to this question and, further, that the video evidence "does nothing to negate the material facts that are disputed." (*Id.* at pp. 4, 6, 8.)  Conte maintains that the objective component of his excessive force claim is met because it is undisputed that he suffered intense pain and a fractured femur because of this incident. (*Id*. at p. 7.)  He further asserts that the subjective component is satisfied because "White had full control over a handcuffed Conte as he was escorting him and there was no resistance or 'pulling away' on the part of Conte as alleged by Defendants." (*Id*. at p. 8.)  Thus, Conte maintains summary judgment should be denied because genuine issues of material fact remain regarding whether Officer White used excessive force when escorting him out of the day room.[8]  (*Id*. at pp. 7-9.)

---

[8] Conte suggests that additional video footage exists that would have provided a better view of the incident, but that Defendants failed to produce any such footage during discovery. (Doc. No. 28 at PageID# 433.) In response, Defendants assert that they "produced any and all video surveillance footage that was made available to them by ODRC." (Doc. No. 29 at p. 3.) Counsel for Defendants further states that he followed up with officials at ODRC and RCI and "was informed video did not exist or was not preserved by ODRC or RCI because this video [i.e., the video produced in discovery and provided to the Court] sufficiently depicted the incident." (*Id*.) To the extent Conte is attempting to raise a discovery deficiency in his Brief in Opposition, any such argument is rejected. The discovery deadline passed over nine (9) months ago, on March 1, 2023. *See* Non-Doc Order dated Dec. 12, 2022. Local Rule 37.1(b) provides, in relevant part, that "[n]o

In his Reply Brief, Officer White argues that "[a]ll one must do is review the video to understand [that] Mr. Conte's claims have no merit."  (Doc. No. 29 at p. 2.)  He insists that the video footage is "clear and unambiguous" and that it "clearly shows that Officer White did not engage in any malicious or sadistic behavior whatsoever."  (*Id*. at pp. 1-2.)  Officer White then argues that Conte cannot satisfy the subjective component of his excessive force claim because he (White) "was clearly within bounds in his attempt to escort Conte from H4-Lower," given Conte's attempt to grab his Medication Pass from Officer Beasley.  (*Id*. at p. 6.)  Officer White further emphasizes that Conte was not being compliant because he continued to speak with Deskins as Officer White was attempting to escort him out of the day room.  (*Id*.)  Regarding the objective component, Officer White argues that this component is not satisfied because he "used a *de minimis* amount of force by pulling on Mr. Conte to obtain his compliance" and "there is no evidence within the record that shows, or can show, Officer White was engaged in a malicious or sadistic use of force."  (*Id*. at p. 7.)

The Court finds that the threshold question in evaluating Officer White's request for summary judgment on this claim is whether there is a genuine issue of material fact that Officer White intentionally slammed or pushed Conte into the doorframe while escorting him out of the day room.

---

discovery dispute shall be brought to the attention of the Court … more than ten (10) days after the discovery cut-off date." Local R. 37.1(b).  The Northern District of Ohio has adhered to the time limit in Local Rule 37.1(b). *See e.g., Sterling Jewelers Inc. v. Alex and Ani, LLC*, 2019 WL 95842 at * 2 (N.D. Ohio Jan. 3, 2019); *Davis v Kirk*, 2019 WL 6221476 at * 8 (N.D. Ohio July 25, 2019); *Balsley v. LFP, Inc.,* 2010 WL 11561883 at * 1-2 (N.D. Ohio Jan. 26, 2010); *Somogy v. South Local School Dist. Bd. of Educ*., 2007 WL 2572173 at *4 (N.D. Ohio, Aug. 31, 2007).  Here, Conte raised this issue for the first time in his Brief in Opposition (Doc. No. 28), which was filed on August 1, 2023—approximately five months after the close of discovery.  Had Conte complied with Local Rule 37.1(b), the Court could have addressed and resolved the issue prior to the filing of dispositive motions. Conte offers no explanation for his failure to timely apprise the Court of his concerns regarding the potential existence of other videos of the October 8, 2019 incident.  Nor does he acknowledge or address the time limit set forth in Local Rule 37.1(b).  Accordingly, the Court finds that Conte has forfeited this issue and will not address it herein.

While Officer White strenuously maintains that the video surveillance footage clearly and unambiguously shows that there is no genuine issue of material fact on this issue, this Court disagrees.

Both the Supreme Court and the Sixth Circuit have discussed how courts should evaluate video footage when analyzing excessive force claims.  In *Scott v. Harris*, 550 U.S. 372 (2007), the Supreme Court explained that "[a]t the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party," but "only if there is a 'genuine' dispute as to those facts." *Scott*, 550 U.S. at 380.   The Court noted that:

> When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id*. at 380–81.  In *Scott*, the Court found that the plaintiff's "version of events is so utterly discredited by the record that no reasonable jury could have believed him."  *Id*.  Thus, the Court found that the lower court in that case "should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape." *Id*.

Interpreting *Scott,* the Sixth Circuit has held that "[t]o the extent that videos in the record show facts so clearly that a reasonable jury could view those facts in only one way, those facts should be viewed in the light depicted by the videos." *Latits*, 878 F.3d at 544 (citing *Scott,* 550 U.S. at 380.) However, "[t]o the extent that facts shown in videos can be interpreted in multiple ways or if videos do not show all relevant facts, such facts should be viewed in the light most favorable to the non-moving party." *Id*. Stated differently, where there are "relevant gaps or uncertainties left by [a] video[]," a court must view those "gaps and uncertainties" in the light most favorable to the non-movant.  *Id*. at 544.  *See also Oliver v. Greene*, 613 Fed. Appx. 455, 457 (6th Cir. 2015) ("Inferences supported by the record, including the video, remain drawn in favor of the non-moving party.")

19

Here, the Court has carefully reviewed the video surveillance footage and considered the parties' arguments with respect thereto.  For the following reasons, the Court disagrees with Officer White that the video footage "clearly and blatantly contradicts" Conte's evidence that Officer White intentionally pushed him into the exit doorframe.  To the contrary, the Court finds that the facts regarding Officer White's escort of Conte through the exit door could be interpreted in multiple ways and, therefore, should be viewed in the light most favorable to Conte.  *See Latits*, 878 F.3d at 544.

The key moment of the video for purposes of this excessive force claim comes when Officer White pulls Conte towards the exit door.  This occurs at approximately 11:31:22 through 11:31:24 on the video.  The Court has carefully and repeatedly viewed both the video footage as a whole, as well as this particular portion of the video.  As noted *supra,* the video camera that recorded the October 8, 2019 incident is located across the day room, at the other end of the room from where the exit door to the sallyport is located.  While the viewer can zoom in to the area of the exit door, the video footage is somewhat blurry and grainy.  The camera angle does not present the clearest view of the exit door and there is a bright light coming from the sallyport area that makes it difficult to discern the parties' movements.  Additionally, during this two-to-three second time frame when Officer White is moving Conte through the exit door, Officer Beasley is positioned in such a way that she at least partially blocks the view of the exit door.

All one can see with certainty is Officer White pulling Conte towards the exit door, and then a sudden acceleration where Conte appears to collide with the doorframe and fall to the ground.  The Court finds that it is simply not clear from the video footage whether Conte collided with the doorframe because Officer White pulled or slammed him into it, or because Conte tripped or fell into the doorframe.  In other words, the video does not show the facts regarding this moment so clearly

20

that a reasonable jury could only view those facts in Officer White's favor.  Thus, the Court must view this portion of the video footage, and all inferences therefrom, in a light most favorable to Conte.

Viewing the evidence in this light, the Court finds that there is a genuine issue of material fact regarding whether Officer White intentionally pushed Conte into the exit doorframe, causing him to fall.  As discussed above, the video footage does not clearly show otherwise.  While Officers White and Beasley testified that Officer White did not push or slam Conte into the doorframe, Conte testified (and averred in a subsequent Declaration) that Officer White did, in fact, intentionally and violently slam him into the doorframe and that this caused him to briefly lose consciousness, fall to the ground, and break his femur.  (Conte Depo. at Tr. 25, 34; Conte Decl. at ¶ 7.)  Conte has also come forward with Declarations from inmates Smith and Arnoff, both of whom aver that they witnessed the October 8, 2019 incident and saw Officer White violently slam Conte into the exit door frame.  *See* Smith Decl. (Doc. No. 28 at PageID#s 454-455); Arnoff Decl. (Doc. No. 28 at PageID# 456) at ¶ 6.

The Court further finds that, if a jury were to find that Officer White intentionally pushed or slammed Conte into the exit doorframe, a jury could then also reasonably find both the objective and subjective components of Conte's excessive force claim to be met. Regarding the objective component, the Sixth Circuit has held that an inmate need not prove "extreme" or "serious" harm, since "the malicious and sadistic infliction of pain violates these contemporary standards whether or not the pain leads to any significant injury." *Johnson*, 79 F. 4th at 616 (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)).  However, the Eighth Amendment "does not apply to '*de minimis* uses of physical force' so long as this force does not repulse 'the conscience of mankind.'" *Id*. (quoting *Hudson*, 503 U.S. at 9-10.)   Here, Conte has introduced evidence of both a serious harm and significant use of physical force. Specifically, Conte has both testified and averred that Officer White

21

violently pushed or "slammed" him into the doorframe, causing him to hit his head, briefly lose consciousness, and fall to the ground. (Conte Depo. at Tr. 25, 34, 36-37; Conte Decl. at ¶ 7; Smith Decl. at PagID# 454.)  Conte has also introduced evidence that (1) prison x-rays taken on October 8, 2019 showed that he broke his femur; (2) he was admitted to the hospital the same day; and (3) he received surgery the next day for a broken femur.  (Conte Depo. at Tr. 43-44; Conte Decl. at ¶ 8.) Lastly, Conte has introduced evidence that he continued to use a walker until his release from custody in February 2020, and that he continues to experience hip pain.  (Conte Depo. at Tr. 46-47, 49, 51-52.)  Viewing this evidence in a light most favorable to Conte, the Court finds that it is sufficient to create a genuine issue of material fact regarding the objective component of his excessive force claim. *See, e.g., Cordell*, 759 F.3d at 577-579 (finding actionable force when a corrections officer rammed a handcuffed inmate headfirst into a concrete wall, putting a large gash in his forehead and requiring an immediate hospital visit.).

The Court likewise finds that, if a jury were to find that Officer White intentionally pushed or slammed Conte into the doorframe, Conte has come forward with sufficient evidence to create a genuine issue of material fact regarding the subjective component.   As noted *supra*, this component requires Conte to prove that Officer White used the force "maliciously and sadistically" to inflict pain.  *Johnson*, 79 F. 4th at 618 (quoting *Hudson*, 503 U.S. at 7.)  "To decide whether a jury could find that an officer acted with this malicious intent, the Supreme Court has identified several factors to consider: What was the extent of the prisoner's injury? What was the nature of the threat that justified the use of force? Was the amount of force proportional to the threat? And did the officer taken any actions designed to reduce the required amount of force?" *Id*. (citing *Hudson*, 503 U.S. at 7 and *Whitley,* 475 U.S. at 321.)  In evaluating these factors, courts should "avoid 'unreasonable *post*

*hoc* judicial second-guessing' of [an officer's] conduct." *Id.* (quoting *Lockett v. Suardini*, 526 F.3d 866, 875 (6th Cir. 2008)).

The first factor is the extent of the prisoner's injury.  As discussed above, viewing the evidence in a light most favorable to Conte, the Court finds that Conte has come forward with evidence that he suffered significant injuries, including loss of consciousness, hip pain, and a broken femur.  It is undisputed that Conte's injuries were sufficiently serious to warrant an immediate hospital visit and surgery the following day.  This evidence, construed in Conte's favor, suggests that Officer White used a considerable amount of force against him. "The use of such force, while certainly not dispositive, makes it more likely that [Officer White] acted with malice." *Cordell*, 759 F.3d at 583.

The second factor is the nature of the threat that justified the use of the force. Stated differently, this factor considers whether the officer had a "plausible basis" to believe that the prisoner constituted a threat who needed to be restrained under all the circumstances. *See Johnson*, 79 F. 4th at 619; *Cordell,* 759 F.3d at 581.  In evaluating this factor, the Sixth Circuit recognizes that "prison officials 'must make their decisions in haste under pressure, and frequently without the luxury of a second chance.'" *Cordell*, 759 F.3d at 518 (quoting *Combs*, 315 F.3d at 557) (quoting *Hudson*, 503 U.S. at 6.)  Therefore, "[t]he issue is … not whether the use of force was absolutely necessary in hindsight, but whether the use of force could plausibly have been thought necessary…" *Griffin v. Hardrick*, 604 F.3d 949, 954 (6th Cir. 2010).

Here, Officer White testified that Conte was not compliant because he turned towards and talked to Deskins and/or Officer Beasley while White was attempting to escort him out of the day room.  The Sixth Circuit has found that "the use of some force could be appropriate when an inmate turns towards a guard, and our prior decisions indicate that prison officials may use appropriate force

23

to regain control of an aggressive inmate." *Cordell*, 759 F.3d at 581 (citing cases).  However, taking Conte's evidence regarding the amount of force used as true, the Court finds that a reasonable jury could find, under the circumstances presented, that Officer White lacked a good faith reason to push Conte into the doorframe. It is undisputed that, when Officer White was escorting Conte out of the day room, Conte's arms were handcuffed behind his back.  Although Conte appears to be turning towards and speaking to Deskins, Defendants have not argued or introduced any evidence that Conte's actions at that moment constituted a threat, either to Officer White, Officer Beasley, Mr. Deskins, or any of the other inmates present in the H4-Lower Dormitory.  Nor has Officer White otherwise argued or presented any evidence that Conte was not under White's control once he was handcuffed.  Under these circumstances, "[i]t is hard to understand – even being deferential to [Officer White's] split-second judgment—how [Conte] would present a sufficient threat to justify" the physical force that Conte accuses Officer White of using.  *Cordell*, 759 F.3d at 583.  Lastly, Defendants do not direct this Court's attention to any evidence in the record that Officer White made any effort to reduce the force he used against Conte in escorting him out of the day room.

In sum, viewing the video and other record evidence in a light most favorable to Conte, the Court finds that there is a genuine issue of material fact regarding whether Officer White intentionally pushed or slammed Conte into the exit doorframe.  The Court further finds that, if a jury were to find that Officer White intentionally pushed or slammed Conte into the doorframe, a reasonable jury could decide that Officer White lacked a good-faith basis for doing so.  Accordingly, and for all the reasons set forth above, the Court finds that there is a genuine issue of material fact regarding whether Officer White used excessive force when he escorted Conte through the exit doorframe on October 8, 2019.

24

Officer White's request for summary judgment in his favor with respect to this claim is, therefore, denied.

Conte also alleges, in Count One, that Officer White used excessive force against him in violation of the Eighth Amendment when he "intentionally fell or jumped with his full body weight on top of Plaintiff." (Doc. No. 8 at ¶ 37, referencing ¶ 20.) Officer White expressly moves for summary judgment in his favor with respect to this claim. (Doc. No. 25 at p. 12.) Conte fails to acknowledge or address this argument in his Brief in Opposition. (Doc. No. 28.)

The Court finds that Conte has abandoned this excessive force claim and summary judgment in favor of Officer White is appropriate with respect thereto. As the Sixth Circuit has recognized, its "jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Michigan, Inc.,* 545 Fed. Appx 368, 372 (6th Cir. 2013). *See also Wierengo v. Akal Sec., Inc.*, 580 Fed. Appx 364, 369 n.1 (6th Cir. 2014); *Hicks v. Concorde Career Coll.*, 449 Fed. Appx 484, 487 (6th Cir. 2011). Accordingly, the Court finds that Officer White is entitled to summary judgment in his favor with respect to Conte's claim in Count One that Officer White used excessive force when he allegedly intentionally fell or jumped on Conte after Conte fell.

**2.      Excessive Force Claim based on White's Attempts to Lift Conte (Count Two)**

Officer White next argues that he is entitled to summary judgment in his favor with respect to Conte's claim in Count Two that he engaged in excessive force by attempting to pull Conte up from and off the ground by his handcuffs after Conte had fallen. (Doc. No. 25 at pp. 13-14.) Officer White asserts that "there is no evidence to support either the subjective or objective components of this claim." (*Id.*) He maintains that the video footage shows that he attempted to lift Conte within

25

ten seconds of Conte falling to the ground.  (*Id*.)  Officer White argues that "ten (10) seconds of Mr. Conte being on the ground is not enough time for Officer White to realize and fully appreciate [that] Mr. Conte was injured as a result of his fall."  (*Id*.)  Officer White further asserts that there is no evidence that his efforts to assist Conte were malicious or sadistic.  (*Id*.)

Lastly, Officer White argues that his actions in "rolling Mr. Conte over and attempting to assist him up from and off of the ground are also *de minimis*."  (*Id*. at p. 14.)  He maintains that his efforts were "neither unnecessary or prolonged" and, further, that there is no evidence that his actions "caused, aggravated, or exacerbated" Conte's fractured femur.  (*Id*.)  In this regard, Officer White notes that Conte "has not presented any expert testimony to establish causation between Officer White's lifting of Conte and Mr. Conte's fractured femur." (*Id*.)

In response, Conte argues that there are genuine issues of material fact regarding whether (1) Conte was initially rendered unconscious when he fell; and (2) Officer White attempted to lift Conte up by his handcuffs.  (Doc. No. 28 at pp. 9-10.)  Regarding the latter, Conte notes that, not only did he (Conte) testify that Officer White tried to "yank him up by the handcuffs," but Officer Beasley also testified that Officer White "lifted [Conte] with one hand on his cuffs and one hand on his arms."  (*Id*. at p. 10) (citing Beasley Depo. at Tr. 62.)  Conte asserts that, once he was on the ground, "there was no excuse for the use of any force, especially force that caused Conte undue pain and suffering."  (*Id*.)

The key portion of the video for purposes of this excessive force claim occurs at approximately 11:31:26 through 11:31:42 on the video.  At approximately 11:31:36, Officer White can be seen rolling Conte over.  At 11:31:37 through 11:31:39, Officer White appears to place one of his hands under Conte's arm and attempts to lift him from the ground.  The video does not clearly

show what Officer Conte is doing with his other hand, i.e., if he is simultaneously using his other hand to try to lift Conte and, if so, how.  *Id*.  The video does show, however, that, after rolling Conte over, Officer White makes only one attempt to lift Conte up from the ground and then stops.  *Id.*

Upon careful review, the Court finds that the video footage does not clearly show whether Officer White attempted to lift Conte up, at least in part, by his handcuffs.  Thus, the Court must view this portion of the video footage, and all inferences therefrom, in a light most favorable to Conte.   In addition, in determining whether Conte has come forward with sufficient evidence to create a genuine issue of material fact on this excessive force claim, the Court also considers the other record evidence relating to Officer White's actions in the moments after Conte fell.

As noted *supra*, during his deposition, Conte testified that Officer White tried to "yank [him] up by the handcuffs." (Conte Depo. at Tr. 25, 37-38.)  In a subsequent Declaration, Conte avers that "White grabbed my cuffs violently yanking my arms up behind my head inflicting enormous pain in my shoulder joints and arm joints." (Conte Decl. at ¶ 7.)  Inmate Smith avers that: "I seen C.O. White grab the handcuffs yanking up Conte violently on his arms going up behind his head attempting to force him up to stand." (Smith Decl. at PageID# 455.) Inmate Arnoff avers that: "[Conte] was complaining of intense pain and the CO[9] forced him to stand up by pulling on the cuffs."  (Arnoff Decl. at ¶ 7.)

Officer White denied ever trying to lift Conte up by his handcuffs, testifying instead that he attempted to help Conte up by lifting him by his arm and forearm only.  (White Depo. at Tr. 17, 34, 47-49.)  Officer Beasley testified as follows:

---

[9] Inmate Arnoff does not identify the "CO" by name and refers to him only as "a short, bald male Officer."  (Arnoff Decl. at ¶ 6.)

> Q:     Okay.  All right, so you, you said you followed Mr. Conte out, Mr. Conte and Mr. White?
>
> A:     Correct, yes.
>
> Q:     Okay. And so you saw the fall, correct?
>
> A:     Correct.
>
> Q:     Did you see Mr. White try to lift Mr. Conte up by his handcuffs?
>
> A:     Yes, one hand was on the back of his handcuffs, the other hand was, would have been kind of in the front of one of his arms.  And the yard officer was in front of Mr. Conte picking him up that direction.

(Beasley Depo. at Tr. 35.)  Later, Officer Beasley was asked about this again, as she was being shown the video footage:

> Q:     Is that where Mr. White attempted to lift him by the cuffs where he's reaching down, right after basically he fell and told him to get up?
>
> A:     He lifted him with one hand on his cuffs and one hand on his arm.

(*Id*. at Tr. 62.)  After a request for clarification by counsel, Officer Beasley explained she was "answering from recollection, because you can't see him actually doing that in the video."  (*Id*.)

Based on the above, the Court finds that Conte has come forward with sufficient evidence to create a genuine issue of material fact regarding whether Officer White used one of his (White's) hands to lift Conte from the ground by his handcuffs.  However, even assuming Officer White did so, Conte must still demonstrate that a jury could then also reasonably find both the objective and subjective components of this excessive force claim to be met.  For the following reasons, the Court finds that Conte has failed to demonstrate that there is a genuine issue of material fact that the subjective component of this excessive force claim is met.

"[A]lthough the Eighth Amendment does not require a prisoner to suffer a 'serious injury,' the 'absence' of such an injury goes a long way to disprove any claim that an officer used force with the required intent to harm." *Johnson,* 79 F. 4th at 618-619 (quoting *Hudson,* 503 U.S. at 7-8.)  Here, Conte has not directed this Court's attention to any evidence that he suffered an injury because of Officer White's actions in lifting him from the ground by his handcuffs.  While Conte avers that he suffered "enormous pain in [his] shoulder joints and arm joints" (Conte Decl. at ¶ 7), he has not come forward with evidence that he received any medical treatment for arm and/or shoulder pain, either directly after the incident or since.  Indeed, when Conte was asked during his deposition to identify what he was "experiencing to this day as result of this incident," he did not identify or describe any injury or pain in his arms and/or shoulders.  (Conte Depo. at Tr. 48-49.)  Nor did he identify any limitations or restrictions on his physical ability to use either his arms or shoulders as a result of the October 8, 2019 incident.  (*Id*. at Tr. 48-49, 51, 53-54.)  Conte's Declaration also fails to detail any specific medical treatment or care for his arms and/or shoulders, either during his post-incident hospital stay or thereafter.  (Conte Decl. at ¶ 8.)

Additionally, and upon close and careful review of the video footage, the Court concludes that Officer White did not use a disproportional amount of force when attempting to lift Conte from the ground.  The entirety of Officer White's efforts to roll Conte over and lift him from the ground comprise approximately twelve (12) seconds of the video.  The video shows that Officer White first rolled Conte to his side and then made one attempt to lift or pull Conte up.  After careful review, the Court finds that the video does not depict Officer White "violently yanking" on Conte to try to lift him from the ground.  Rather, the video footage shows Officer White (using two hands, one of which was on Conte's arm) attempting to lift Conte him from the ground but stopping before significantly

moving Conte in an upward direction.  In addition, the video footage is clear that Officer White did not make repeated or prolonged attempts to move Conte into an upright position.  Thus, any use of force by Officer White was limited and immediately discontinued after it was clear that Conte could not stand.

Based on the above, the Court finds that Conte has failed to demonstrate that there is a genuine issue of material fact that Officer White used the force at issue "maliciously and sadistically" to inflict pain.  *See Johnson*, 79 F. 4th at 618; *Hudson*, 503 U.S. at 7.  Accordingly, the Court finds that Officer White is entitled to summary judgment in his favor with respect to Conte's excessive force claim as set forth in Count Two.

### B. Medical Deliberate Indifference Claims (Counts Three, Four, and Five)

Conte alleges three claims under § 1983 for deliberate indifference to his serious medical needs in violation of the Eighth Amendment.  In Count Three, Conte alleges that Officer Beasley failed to provide adequate medical care "by confiscating his medical pass, [thereby] denying Plaintiff the access to medication he was required to take at a specific time daily."  (Doc. No. 8 at ¶ 44.)  Conte further alleges that Officer Beasley's "actions were deliberate and indifferent with full knowledge of the substantial harm that could come to Plaintiff and possibly others if the medicine was not taken as required." (*Id*. at ¶ 45.)

In Count Four, Conte alleges that Officers White and Beasley "failed to timely request medical care for the Plaintiff or offer assistance and instead C/O White initially aggravated the injury by trying to forcibly lift the Plaintiff off the ground by yanking on his handcuffed hands." (*Id*. at ¶ 47.)  Conte alleges that "[o]nce a small, motorized cart known as the mini-ambulance used for medical emergencies arrived on the scene, C/O White and C/O Beasley … ignored the availability of the mini-

30

ambulance and specially chose to use a wheelchair and ordered untrained inmates to lift Plaintiff from the ground and place him in the wheelchair to transport him to the prison infirmary, causing the Plaintiff great pain and suffering in the process."  (*Id.* at ¶ 48.)  Conte alleges that "Defendants' actions were taken with deliberate indifference to Plaintiff's medical condition with full knowledge of the substantial risk of aggravating Plaintiff's already existing injuries." (*Id*. at ¶ 49.)

Lastly, in Count Five, Conte alleges that "R.I.C.I. medical staff made Defendants aware of Plaintiff's serious medical condition involving a fracture of Plaintiff's femur near the hip area" but "[d]espite having such knowledge and in deliberate indifference to Plaintiff's medical needs he was provided no form of pain medication, removed from the infirmary and while in excruciating pain placed in the hole by the Defendants for over an hour before receiving transport to an outside medical facility."  (*Id*. at ¶¶ 51, 52.)  Conte alleges that Defendants' "actions caused an obvious medical condition to worsen and increased [his] pain and suffering."  (*Id.* at ¶ 53.)

Defendants move for summary judgment in their favor with respect to each of the above Counts, asserting that Conte has failed to come forward with any evidence to support deliberate indifference to Conte's medical needs by either Officers White or Beasley. (Doc. No. 25 at pp. 14-20.)  Conte opposes Defendants' Motion, asserting that genuine issues of material fact exist as to each of his medical deliberate indifference claims.  (Doc. No. 28 at pp. 11-14.)

As noted above, the Eighth Amendment protects an individual from "cruel and unusual punishments." U.S. Const. amend. VIII.  The Supreme Court has held that a government official violates an incarcerated person's Eighth Amendment rights when the official shows "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  *See also Murray v. Department of Corrections*, 29 F.4th 779, 786-787 (6th Cir. 2022).  An inmate can bring suit under

31

§ 1983 for an Eighth Amendment violation "whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id. See also Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004).

Deliberate indifference claims under the Eighth Amendment have both an objective and a subjective component. *See Murray*, 29 F.4th at 786; *Phillips v. Tangilag*, 14 F.4th 524, 534 (6th Cir. 2021); *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018); *Blackmore*, 390 F.3d at 895. The objective component requires that the deprivation of medical treatment be "sufficiently serious." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). *See also Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The Sixth Circuit has held that a "sufficiently serious" medical need is a medical condition that has been "diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Santiago v. Ringle*, 734 F.3d 585, 590 (6th Cir. 2013). *See also Phillips*, 14 F. 4th at 534; *Rhinehart*, 894 F.3d at 737.

The subjective component requires a prisoner to demonstrate that prison officials had a "sufficiently culpable state of mind" in denying him medical care. *Wilson*, 501 U.S. at 297. *See also Estate of Majors v. Gerlach*, 821 Fed. Appx. 533, 541 (6th Cir. 2020). "Under [Sixth Circuit] case law, [this] means 'something more than mere negligence,' but may be shown 'by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Estate of Majors*, 821 Fed. Appx. at 541 (quoting *Farmer,* 511 U.S. at 835). Ultimately, a prison official must have known of and disregarded "an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. The official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference." *Id*. The Sixth

32

Circuit has emphasized that "[k]nowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." *Horn by Parks v. Madison Cty. Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994).  *See also Blackmore*, 390 F.3d at 896; *Estate of Majors*, 821 Fed. Appx. at 541.  A prison official can escape liability by showing that they "responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

With the above principles in mind, the Court will address Defendants' request for summary judgment with respect to Counts Three through Five separately, below. [10]

### 1.   Denial of Access to Conte's Medication (Count Three)

Officer Beasley argues that she is entitled to summary judgment in her favor with respect to Conte's claim, in Count Three, that Beasley was deliberately indifferent to his serious medical needs when she "confiscated his medical pass" and denied him access to medication that he was required to take at 11:30 a.m. each day.  (Doc. No. 25 at pp. 18-19.)  Officer Beasley first asserts that there is no evidence that she did, in fact, "confiscate" Conte's medication pass.  (*Id.*)  Rather, Officer Beasley asserts that the evidence shows she examined Conte's pass and reasonably advised him that he had to wait until "chow" was called before being released to get his medication.  (*Id.*)

Officer Beasley next argues that Conte's claim fails because he is unable to satisfy either the objective or subjective components of the medical deliberate indifference standard. (*Id.*) Regarding the objective component, Beasley maintains that Conte cannot demonstrate that he had a serious medical need to take his "psych med" at precisely 11:30 a.m. because he failed to either identify the

---

[10] The Court notes that Officers White and Beasley do not argue, at any point in their Motion for Summary Judgment, that they are entitled to qualified immunity with respect to Conte's § 1983 medical deliberate indifference claims.  (Doc. No. 25.)  Thus, the Court does not address Counts Three through Five in the context of a qualified immunity analysis.

name of the medication at issue or present any evidence regarding the effect of not taking it at 11:30 a.m. on the date in question.  (*Id*.)  She further asserts that Conte's claim fails because "there is no evidence that Mr. Conte in fact suffered any injury, or other serious medical need, specifically because he did not take this medication at 11:30 a.m. on October 8, 2019." (*Id*. at p. 19.)  Regarding the subjective component, Officer Beasley argues that she "had no reason to perceive a substantial risk to Mr. Conte's medical needs by requiring him to wait to be excused from H4-Lower until lunch or 'chow' was summoned." (*Id*.)

In response, Conte argues that Officer Beasley herself testified that she "snatched" Conte's Medication Pass from him and never gave it back.  (Doc. No. 28 at p. 11) (citing Beasley Depo. at Tr. 17, 19.)  Conte next asserts (without directing this Court's attention to any evidence in the record) that "there is no question that Conte was diagnosed with a severe depressive disorder and was prescribed medication for the condition." (*Id*. at p. 12.)  He maintains that this is sufficient, standing alone, to create a genuine issue of material fact regarding whether his medical need for his medication is "sufficiently serious" for purposes of the objective component of the medical deliberate indifference standard.  (*Id*. at p. 12.)  Conte next argues that there is a genuine issue of material fact regarding whether the subjective prong is satisfied because Officer Beasley admitted in her deposition that Conte told her what the pass was for and, therefore, "she was aware of his health issue and ignored it." (*Id*.)  In sum, Conte maintains that "[m]edical care was prescribed for Conte in the form of daily medication and his ability to get that medication was intentionally interrupted." (*Id*. at p. 13.)

For the following reasons, the Court agrees with Officer Beasley that Conte has failed to come forward with evidence demonstrating a genuine issue of material fact regarding either the objective or subjective components of the medical deliberate indifference standard.

As noted above, the objective component requires a plaintiff to prove that the alleged deprivation of medical care was serious enough to violate the Eighth Amendment. *Rhinehart*, 894 F.3d at 737.  This requires a plaintiff to establish that he has a "serious medical need" by, for example, "showing that a doctor has diagnosed a condition as requiring treatment or that the prisoner has an obvious problem that any layperson would agree necessitates care." *Phillips,* 14 F. 4th at 534.  The Sixth Circuit has "generally held that when a deliberate indifference claim is based on a delay in treatment, rather than the failure to treat at all, the plaintiff must 'place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment.'" *Estate of Majors*, 821 Fed. Appx. at 539 (quoting *Santiago*, 734 F.3d at 590).

Here, the basis of Conte's deliberate indifference claim appears to be the delay or "interruption" of his prescribed mental health medication.  It is unclear, however, whether Conte is alleging deliberate indifference based on the deprivation of his mental health medication solely on the date of the October 8, 2019 incident, or based on an allegedly longer term deprivation of this medication.  The Court notes that Conte does not argue or direct this Court's attention to any evidence that Officer Beasley (or anyone else for that matter) denied him access to his mental health medication on any date other than October 8, 2019  Conte did not testify to this effect in his deposition, nor did aver in his Declaration that he was denied access to his mental health medication on any date other

than October 8, 2019. [11]    Thus, the Court construes this claim as alleging a violation of Conte's Eighth Amendment rights based on Officer Beasley's refusal to allow him to leave the H4-Lower Dormitory at 11:30 a.m. on October 8, 2019 to take his mental health medication.

The Court finds that Conte has failed to come forward with evidence to create a genuine issue of material fact that the deprivation of his unidentified "psych med" on October 8, 2019 was objectively "serious enough to violate the Eighth Amendment." *Rhinehart*, 894 F.3d at 737.  Conte has not directed this Court's attention to any evidence in the record regarding either the name of the specific mental health medication that he was taking on October 8, 2019 or the condition for which it was prescribed. [12]   In deposition, Conte testified that he could not recall his exact prescription or what it is was for:

> Q:     … Prior to this incident occurring, you stated that you were taking a medication and that you had a medication pass.  What was that medication that you were taking?
>
> A:     It was for mental health.
>
> Q:     Mental health.  Do you know what the exact prescription was?
>
> A:     I couldn't tell you at this time.
>
> Q:     You just—it's just for mental health?
>
> A:     That's – yeah, I couldn't tell you the medicine at this time.
>
> Q:     Okay.  They didn't tell you whether it was like just an antidepressant or an antianxiety medication?

---

[11] Conte testified that (after his hospitalization, return to RCI, and release from the segregation unit) he was given a new Medication Pass that specifically stated that he was permitted to leave the H4-Lower Dormitory each day at "11:30 a.m. when count clears" and was signed by his psychiatrist, Gary Sales, M.D.  (Doc. No. 22 at Tr. 60-61; Doc. No. 22-3 at PageID# 228.)  This Medication Pass has an effective date of November 27, 2019.  (Doc. No. 22-3 at PageID# 228.)

[12] In his Brief in Opposition, Conte states that "[t]here is no question that [he] was diagnosed with a severe depressive disorder and was prescribed medication for the condition."  (Doc. No. 28 at PageID# 442.)  Conte does not, however, direct this Court's attention to any record evidence in support of this statement.

A:      I couldn't tell you at this time.  I don't recall.

(Conte Depo. at Tr. 11-12.)  Nor has Conte directed this Court's attention to any evidence in the record regarding any potential detrimental medical effect of missing a dose of his unidentified mental health medication.  Indeed, when Conte was asked in deposition "what would have happened to [him]" if he missed this medication, he replied "I'm not sure."[13]  (*Id.* at Tr. 35-36.)  Lastly, Conte has not directed this Court's attention to any evidence that he did, in fact, suffer any detrimental medical consequences because he was not provided his mental health medication on October 8, 2019.

In the absence of any evidence regarding the above, the Court finds that Conte has failed to demonstrate a genuine issue of material fact regarding the objective component of this deliberate indifference claim.  Moreover, even assuming *arguendo* that there was a genuine issue of material fact regarding the objective component, the Court finds that Conte's claim nonetheless fails because he has failed to come forward with sufficient evidence to create a genuine issue of material fact regarding the subjective component.

To satisfy the subjective component, Conte must demonstrate that Officer Beasley had a "sufficiently culpable state of mind" in denying him medical care.  *Wilson*, 501 U.S. at 297.  Officer Beasley "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference."  *Id.*  "Knowledge of the asserted

---

[13] The Court notes that Conte introduced evidence regarding a previous incident in May 2015 during which he was allegedly deprived of his "prescribed psych medication" by the Summit County Jail for several days, causing him to "go into heart failure and [he] had to be hospitalized immediately."  (Conte Dec. at ¶ 3; Conte Depo. at Tr. 15-17.) To the extent Conte is suggesting that this 2015 incident demonstrates that deprivation of his medication on October 8, 2019 would pose a substantial risk of harm, the Court finds this argument to be without merit.  In his deposition, Conte explained that, in 2015, he was taking a different medication that he was taking in October 2019.  (Conte Depo. at Tr. 71-72.)  He further explained that the Summit County Jail officials deprived him of his 2015 medication for several days, as opposed to the one-day deprivation at issue herein.  (*Id.* at Tr. 17.)

serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." *Horn by Parks*, 22 F.3d at 660.

Here, Conte has not directed this Court's attention to any evidence that Officer Beasley was aware that there was a "substantial risk of serious harm" in denying Conte access to his medication at precisely 11:30 a.m. and, instead, requiring him to wait until lunch or "chow" was called. Conte cites no evidence either that Officer Beasley was aware of any information from which she could draw the inference that a short delay in allowing Conte to take his mental health medication would pose a substantial risk of serious harm, or that she drew such an inference. Notably, Conte did not testify or aver that he told Officer Beasley that there was a medical reason that he could not wait to take his mental health medication until after "chow" was called. Rather, Conte testified that, when Officer Beasley told him that he was not allowed to leave at 11:30 a.m., he told her that "I've got to get my meds in order to go to school on time." (Conte Depo. at Tr. 24.) Based on the above, the Court finds that Conte has failed to come forward with sufficient facts to demonstrate a genuine issue of material fact regarding the subjective component of the deliberate indifference test.

Accordingly, and for all the reasons set forth above, the Court finds that Officer Beasley is entitled to summary judgment in her favor with respect to Count Three.

### 2. Failure to Timely Request Medical Care and Decision to Use Wheelchair Instead of Mini-Ambulance (Count Four)

Officers White and Beasley argue that they are entitled to summary judgment in their favor with respect to Conte's claims, in Count Four, that they (1) failed to timely request medical care for Conte or offer him assistance after he fell; (2) improperly ignored the availability of the "mini-ambulance" (or "Red Barron") and chose instead to use a wheelchair to transport Conte to the infirmary; and (3) ordered "untrained inmates to lift [Conte] from the ground and place him in the

wheelchair, causing Conte "great pain and suffering in the process."  (Doc. No. 25 at pp. 16-17.)  Officers White and Beasley argue that Conte has failed to come forward with any evidence to support these claims.  (*Id*.)  They note that Officer White testified that he immediately summoned medical personnel to assist, and Mr. Deskins averred medical personnel did, in fact, arrive on the scene to assist Conte shortly after his fall.  (*Id.*)  Defendants further assert that, once medical personnel arrived, both Officer White and Officer Beasley returned to their posts within the H4-Lower Dormitory and were not involved in the decision to place Conte in a wheelchair as opposed to the Red Barron.  (*Id*.)  Defendants also maintain that "[t]hat there is no evidence demonstrating that Officers Beasley and White ordered untrained incarcerated individuals to lift Mr. Conte from the ground and place him in the wheelchair."  (*Id*. at p. 17.)  Based on the above, Officers White and Beasley argue that Conte "simply cannot satisfy the subjective component of this medical deliberate indifference claim."  (*Id*.)

In response, Conte argues that Officer White never testified that he requested medical assistance after Conte fell and, further, that Officer Beasley affirmatively stated that she did not call for medical assistance because she believed it was not needed.  (Doc. No. 28 at p. 13-14.)  Conte asserts, summarily and without citation to authority, that "[e]ven if Deskins ultimately had medical contacted as he claims in his declaration, the fact still exists that neither Beasley or White did and they are the named Defendants in this action."  (*Id.* at p. 14.)  Conte does not address Defendants' arguments that neither Officer White nor Officer Beasley had any involvement in the decision to use the wheelchair instead of the Red Barron, and/or the decision to direct inmates to help Conte into the wheelchair.  (Doc. No. 28.)

The Court first addresses Conte's claim that Officers White and Beasley were deliberately indifferent to his serious medical needs because they failed to timely request medical care or assist

Conte after he fell. The evidence regarding this claim is as follows. Mr. Deskins averred that, after Conte fell, he instructed an unidentified female staff member "to summon medical personnel and a 'yard' officer to the scene so as to address Mr. Conte's situation and distress." (Deskins Decl. at ¶ 12.) Mr. Deskins further avers that:

> **Within one to two minutes of Mr. Conte falling, medical personnel arrived** in a "Red Barron," which is a utility vehicle, so as to medically assist Mr. Conte. A "yard" officer also approached the scene. Once medical personnel and the "yard" officer presented to the scene, Officers Beasley and White returned to their posts within the "H4-Lower" housing unit.

(*Id.* at ¶ 13) (emphasis added). Officer White testified that, after Conte fell, he called for a "Red Barron" and that, once a yard officer and medical arrived, he (White) went back to his post. (White Depo. at Tr. 15-16, 48.) Officer Beasley testified that she did not call for medical but that, once the yard officer arrived, she returned to her post and does not know what happened to Conte thereafter. (Beasley Depo. at Tr. 8, 35-36, 39.)

Conte does not direct this Court's attention to any contrary evidence. Notably, Conte does not offer any evidence contradicting Mr. Deskin's Declaration that medical personnel arrived to assist Conte "within one to two minutes" of his fall. (Doc. No. 28 at pp. 13-14.) Rather, Conte appears to assert that, even if medical personnel arrived promptly after his fall, Officers Beasley and White should nonetheless be liable for deliberate indifference because they did not personally call for medical assistance. Conte cites no legal authority in support of this argument and the Court finds it to be without merit under the circumstances presented. Even assuming *arguendo* that neither Officer White nor Officer Beasley personally called for medical assistance, Conte does not dispute that Deskins immediately requested that medical personnel be summoned and, further, that medical personnel arrived within one to two minutes of his fall. Given these undisputed facts, the Court finds

40

that Conte has failed to demonstrate that a reasonable jury could find that either Officer White or Officer Beasley had "sufficiently culpable states of mind" or were otherwise deliberately indifferent to his serious medical needs.  Accordingly, the Court finds that Officers White and Beasley are entitled to summary judgment in their favor with respect to this deliberate indifference claim.

The Court further finds that Officers White and Beasley are entitled to summary judgment in their favor with respect to Conte's claim that they were deliberately indifferent to his serious medical needs because they chose to use a wheelchair (instead of the Red Barron) to transport Conte to the infirmary and ordered "untrained inmates" to lift Conte from the ground and place him in the wheelchair.  Officer White, Officer Beasley, and Mr. Deskins all testified and/or averred that, once the Red Barron and arrived, White and Beasley returned to their posts.  (Deskins Decl. at ¶ 13; White Depo. at Tr. 15-16, 48; Beasley Depo. at Tr. 8, 35-36, 39.)  Conte does not argue, or direct this Court's attention to any evidence, that Officer White or Officer Beasley had any involvement in either the decision to transport him in a wheelchair instead of the Red Barron, or the decision to use inmates to assist Conte from the ground into the wheelchair.[14]  Accordingly, and in the absence of any meaningful argument or evidence to the contrary, the Court finds that Officers White and Beasley are entitled to summary judgment in their favor with respect to Count Four.

### 3. Failure to Provide Pain Medication Pending Transport to outside Medical Facility (Count Five)

Lastly, Officers White and Beasley argue that they are entitled to summary judgment in their favor with respect to Conte's claim, in Count Five, that they were deliberately indifferent to his

---

[14] Indeed, to the contrary, Conte testified in deposition that he could not recall whether Officer White or Officer Beasley remained on the scene after medical personnel arrived.  (Conte Depo. at Tr. 40.)  He further testified that he could not recall who put him in the wheelchair.  (*Id.*)

serious medical needs because he was denied pain medication in the prison infirmary and placed in segregation for over an hour before receiving transport to the hospital. (Doc. No. 25 at pp. 19-20.) Defendants argue that "[t]he evidence on the record demonstrates that neither Officer Beasley nor Officer White were present or involved with any decision relating to Mr. Conte's care or location after leaving H4-Lower." (*Id*.) Conte fails to acknowledge or address this argument in his Brief in Opposition. (Doc. No. 28.)

The Court finds that Conte has abandoned this medical deliberate indifference claim and summary judgment in favor of Officers White and Beasley on Count Five is appropriate with respect thereo. *See Brown*, 545 Fed. Appx. at 372 (finding that "a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment"). *See also Wierengo*, 580 Fed. Appx. at 369, n 1.; *Hicks*, 449 Fed. Appx. at 487. Accordingly, the Court finds that Defendants are entitled to summary judgment in their favor with respect to Count Five.

## V. Conclusion

Accordingly, and for all the reasons set forth above, Defendants' Motion for Summary Judgment (Doc. No. 28) is GRANTED IN PART and DENIED IN PART, as follows. Defendants' Motion is GRANTED with respect to Conte's claim in Count One that Officer White used excessive force when he intentionally fell or jumped on Conte after Conte fell through the exit door frame on October 8, 2019. Defendants' Motion is also GRANTED with respect to Counts Two, Three, Four, and Five of the Amended Complaint. Defendants' Motion is DENIED with respect to Conte's claim

in Count One that Officer White intentionally slammed him into the exit door frame when escorting

him out of the H4-Lower Dormitory on October 8, 2019.

**IT IS SO ORDERED.**


Dated: January 8, 2024                                     s/Pamela A. Barker
                                                          PAMELA A. BARKER
                                                          U.S. DISTRICT JUDGE